UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| ROBERT S. STACHON and ROBERT L. STACHON, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Cause No. 2:12-cv-440 ) |
| DOCK W. WOODWARD, JR., YELLOW TRANSPORTATION, AND YRC, INC., | ) ) ) |
| Defendants. | ) |

**OPINION AND ORDER**

This matter is before the court on the Motion to Exclude Opinions of Plaintiffs' Designated Expert Stuart Nightenhelser [DE 72] filed by the defendants, Dock W. Woodward, Jr. and YRC, Inc., on August 11, 2015. For the following reasons, the motion is **DENIED**.

*Background*

This case arose from a motor vehicle accident that occurred on September 15, 2012. At approximately 1:55 a.m., the defendant, Dock Woodward, Jr., was driving a tractor trailer owned by the defendant, YRC, Inc., on a dark, unlit portion of Highway 41 outside Lowell, Indiana. While driving southbound on Highway 41, Woodward hit a pedestrian, Robert L. Stachon, the plaintiff. Stachon has alleged that Woodward negligently caused his injuries.

Stachon has retained an expert, Stuart Nightenhelser, to show that Woodward should have seen him before the collision. Nightenhelser found that Woodward was inattentive to the roadway and could have seen Stachon from 400 to 450 feet away. Nightenhelser conducted an experiment using an exemplar truck and a manikin to reach his conclusions. The manikin, wearing Stachon's clothing, was placed on the right-hand shoulder of Highway 41, and the

exemplar truck was positioned 475 feet away. Nightenhelser aligned the manikin directly with the exemplar truck's right headlight.

Nightenhelser's assistant took photographs every twenty-five feet from within the tractor. Additionally, Nightenhelser measured the illuminance of the exemplar truck's headlights every twenty-five feet. Nightenhelser relied on the photographs, illuminance calculations, and other data to make his conclusions. The defendants have requested the court to exclude the results of Nightenhelser's experiment because he did not conduct the experiment under substantially similar conditions to the actual accident.

*Discussion*

The admissibility of expert evidence is governed by Federal Rule of Evidence 702, ***Daubert v. Merrell Dow Pharms., Inc.***, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and its progeny. ***Winters v. FruCon Inc.***, 498 F.3d 734, 741 (7th Cir. 2007). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Under ***Daubert***, the court exercises a "gatekeeping" function to ensure that expert testimony is both reliable and relevant pursuant to Rule 702. ***Lees v. Carthage Coll.***, 714 F.3d 516, 521 (7th Cir. 2013); ***Winters***, 498 F.3d at 741; ***Kumho Tire Co., Ltd. v. Carmichael***, 526 U.S. 137, 141, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999). The examination applies "to all kinds of expert testimony." ***U.S. v. Conn***, 297 F.3d 548, 555 (7th Cir. 2002) (noting that Rule 702 makes no distinction between "scientific" knowledge and other forms of specialized knowledge) (citing

*Kumho Tire*, 526 U.S. at 149). The main purpose of the court's gatekeeping requirement "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.

In light of *Daubert* and *Kumho Tire*, the Seventh Circuit has endorsed a two-step analysis for district courts to use in evaluating expert testimony under Rule 702: first, the court must determine whether the expert's testimony is "reliable;" and second, the court must determine whether the expert's testimony is "relevant." *Lees*, 714 F.3d at 521; *Hardiman v. Davita Inc.*, 2007 WL 1395568 (N.D. Ind. May 10, 2007). Like all questions of admissibility, those regarding a witness's testimony are matters of law to be determined by the judge. *Hardiman*, 2007 WL 1395568 at *2 (quoting and citing *Porter v. Whitehall Labs., Inc.*, 791 F. Supp. 1335, 1342 (S.D. Ind. 1992), *aff'd*, 9 F.3d 607 (7th Cir. 1993). "The burden of showing an expert's testimony to be relevant and reliable is with the proponent of the evidence." *Bickel v. Pfizer, Inc.*, 431 F. Supp. 2d 918, 921 (N.D. Ind. 2006).

To satisfy the reliability requirement, the expert must be qualified in the relevant field, and his opinion must be based on sound methodology. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000); *see Hardiman*, 2007 WL 1395568 at n.1 (discussing courts' ability to combine the qualifications inquiry into the reliability prong). In determining whether an expert is qualified to render an opinion, the court should consider his "full range of practical experience as well as academic or technical training . . . ." *U.S. v. Parra*, 402 F.3d 752, 758 (7th Cir. 2005) (quoting *Smith*, 215 F.3d at 718). Still, "[a] court's reliability analysis does not end with its conclusion that an expert is qualified to testify about a given matter . . . . [T]he court's gatekeeping function [also] focuses on an examination of the expert's methodology." *Smith*,

215 F.3d at 718. Hence, an expert's work is admissible "only to the extent it is reasoned, uses the methods of the discipline, and is founded on data. Talking off the cuff—deploying neither data nor analysis—is not an acceptable methodology." *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000).

> *Daubert* outlined the following factors in assessing an expert's methodology:
>
> > (1) whether a theory or technique . . . can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique or method has met with general acceptance.

*Conn*, 297 F.3d at 555 (quoting *Daubert*, 509 U.S. at 593–94). No matter what type of specialized information is proffered, "the *Daubert* factors set forth above ought not be considered a definitive check list suitable for the evaluation of all kinds of evidentiary submissions involving specialized knowledge." *Conn*, 297 F.3d at 555–56. The list should be flexible "to account for the various types of potentially appropriate expert testimony" rather than definitive or exhaustive. *Depulty v. Lehman Bros., Inc.*, 345 F.3d 494, 505 (7th Cir. 2003); *see Lees*, 714 F.3d at 521 ("[B]ecause there are 'many different kinds of experts, and many different kinds of expertise,' the reliability analysis should be geared toward the precise sort of testimony at issue and not any fixed evaluative factors.") (citing *Kumho Tire*, 526 U.S. at 150). The court may tailor its approach using the *Daubert* factors as a starting point in an effort to evaluate the particular evidence before it. *Conn*, 297 F.3d at 556.

The expert testimony must "fit the issue to which the expert is testifying." *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002) (internal citations and quotations omitted). Further, "[i]t is critical under Rule 702 that there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support." *U.S. v.*

4

*Mamah*, 332 F.3d 475, 478 (7th Cir. 2003) (citing *Gen. Elec. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997)). As the Supreme Court wrote: "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec.*, 522 U.S. at 146. Therefore, an expert "who invokes 'my expertise' rather than analytic strategies widely used by specialists is not an expert as Rule 702 defines that term." *Zenith Elec. Corp. v. WH-T Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005); *see Mamah*, 332 F.3d at 478 ("The court is not obligated to admit testimony just because it is given by an expert."). Rather, the Seventh Circuit has reiterated: "[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Zenith Elec. Corp.*, 395 F.3d at 419 (collecting cases of reiteration).

Once evidence is deemed reliable, it still must be excluded if it is not relevant, which under Rule 702 means that it is not likely "to assist the trier of fact to understand the evidence or determine a fact in issue . . . ." *U.S. v. Hall*, 93 F.3d 1337, 1342 (7th Cir. 1996). The expert testimony must relate to an issue in the case, or it is not relevant. *Daubert*, 509 U.S. at 591. To "assist" a jury, the Seventh Circuit has explained that the expert testimony will not aid a jury if it "addresses an issue of which the jury is already generally aware, and it will not contribute to their understanding of the particular dispute." *Hall*, 93 F.3d at 1104. Alternatively, if, because of the expert's knowledge of relevant facts, the expert's particular use of those facts "will help the trier determine a fact, then the opinion is admissible under Rule 702." *Porter*, 791 F. Supp. at 1343.

The defendants have not challenged Nightenhelser's qualifications or the relevance of his testimony. However, the court finds that Nightenhelser is qualified to testify as an expert in the field of lighting and illumination and that his testimony is relevant. Nightenhelser has a

bachelor's degree in physics and mathematics and has worked as a physicist, accident reconstructionist, and visibility consultant for over twenty-two years. Additionally, he has testified as an expert witness in over fifty cases. Furthermore, Nightenhelser's testimony is relevant because it will assist the trier of fact in determining when Woodward could see Stachon and whether Woodward had time to avoid the accident.

The defendants have argued that Nightenhelser's conclusions should be excluded because he did not conduct his experiment under substantially similar conditions to the actual accident. To avoid unfair prejudice, evidence of an experiment is admissible only if the experiment was conducted under substantially similar conditions to the actual event. *United States v. Jackson*, 479 F.3d 485, 489 (7th Cir. 2007). However, the experiment does not need to be identical because opposing counsel can explore dissimilarities on cross-examination. *Jackson*, 479 F.3d at 489. Generally, dissimilarities affect the weight of the evidence and not the admissibility. *Jackson*, 479 F.3d at 489.

Courts apply the substantially similar requirement differently depending on the experiment's purpose. *Jackson*, 479 F.3d at 489. If the experiment was conducted to recreate an event, the court applies a higher standard that requires nearly identical conditions to the actual event. *Jackson*, 479 F.3d at 489. Alternatively, if the experiment was conducted to rebut or falsify the opposing party's hypothesis, the court applies a relaxed standard. *Jackson*, 479 F.3d at 489. Under the relaxed standard, courts may admit the evidence and allow the opposing party to identify the dissimilarities on cross-examination. *Jackson*, 479 F.3d at 490.

The defendants have presented four challenges to Nightenhelser's experiment. First, they have indicated that Nightenhelser aligned the manikin directly with the exemplar truck's right headlight. The defendants have argued that there was no evidence that Stachon was aligned

6

directly with the truck for 475 consecutive feet before the collision. Rather, they noted that Woodward testified that Stachon walked in front of the truck immediately before the collision. Therefore, they argued that the experiment was not substantially similar because Stachon was on the side of the truck as opposed to directly aligned with the right headlight.

Although Woodward testified that Stachon walked in front of the truck immediately before the collision, he also told Sgt. Nestorovich that he saw Stachon in the roadway out of nowhere and that he swerved toward the center of the road to avoid him. Additionally, there is no evidence demonstrating Stachon's location before the collision. Therefore, it is not clear whether Stachon walked in front of Woodward's truck or whether Woodward failed to see Stachon in the roadway until immediately before the collision. Without knowing Stachon's location conclusively, Nightenhelser conducted the experiment with the manikin placed at one of Stachon's possible locations. Rather than exclude the experiment based on this issue, any dissimilarity should affect the weight of the experiment because Stachon's exact location and movement are not clear and Nightenhelser chose one of the possibilities. The defendants may explore the accuracy of the experiment based on the manikin's location on cross-examination.

Second, the defendants have claimed that Nightenhelser failed to determine whether the bulbs in the exemplar truck produced a different light output than the YRC truck. They indicated that the light output of new, identical bulbs might vary by thirty percent. Additionally, they noted that the light output fades in older bulbs, creating greater variance if the bulbs were not a similar age. The defendants have argued that Nightenhelser did not know the age or type of the bulbs in the exemplar truck or the YRC truck.

Although the defendants have argued that Nightenhelser failed to compare the headlights, Stachon indicated that the accident destroyed the right headlight. Therefore, he could not

7

determine the bulb's age or type. However, Nightenhelser recreated the accident as closely as possible by using the same model truck with the same headlight assembly. Furthermore, Nightenhelser's affidavit stated that the trucks used the same headlamps. The defendants have demonstrated that the type and age of the bulbs might affect the light output, but Nightenhelser could not account for those factors because the accident destroyed the YRC truck's right headlight. Nightenhelser conducted the experiment as similarly as possible without an ability to compare the headlights. The defendants may question him on cross-examination about any variance in light output.

Third, the defendants have indicated that Nightenhelser used a stationary tractor without a trailer as opposed to a moving tractor with two cargo-loaded trailers. They have argued that the weight of the trailers affected the truck's pitch and shifted the light output. Additionally, they claimed that Nightenhelser failed to address other factors that would affect the pitch, including the suspension settings and condition, tire pressure, and the truck's movement.

However, Nightenhelser stated that the missing trailers did not affect the headlights. He indicated that the suspension leveled the tractor automatically whether or not trailers were attached. Therefore, any differences in the trailer load would not affect the headlights. He also testified that the truck's movement would not affect the headlights but would affect the driver's recognition of Stachon. Thus, using a stationary tractor did not affect the experiment's accuracy. Because Stachon has demonstrated that the above factors did not affect the truck's headlights, this issue does not warrant exclusion.

Fourth, the defendants have stated that Nightenhelser failed to compare the headlights' alignment. The defendants noted that the Federal Motor Carrier Safety Regulations allow the brightest spot of the beam to strike the road anywhere from 167 feet to 500 feet in front of the

8

truck. Therefore, the headlight beam from the exemplar truck could differ by more than 300 feet than the beam from the YRC truck if the alignments were different. However, the defendants have indicated that Nightenhelser did not compare the headlight alignment between the two trucks.

Stachon has indicated that the accident destroyed the YRC truck's headlight alignment. Therefore, Nightenhelser could not compare the exemplar truck's alignment to the YRC truck's alignment. However, Nightenhelser confirmed that the exemplar truck's headlights were aimed properly. Considering that the YRC truck's headlight alignment was destroyed, Nightenhelser conducted the experiment as similarly as possible. The defendants may address any variance from headlight alignment on cross-examination.

Although the defendants have presented four dissimilarities between the experiment and the accident, the court finds the experiment substantially similar to the accident. Nightenhelser was not required to conduct an experiment under identical conditions to the accident. Rather, this is a flexible requirement that allows parties to explore dissimilarities on cross-examination. Nightenhelser used an exemplar truck that was the same model and had the same headlights. Additionally, he indicated that the missing trailers did not affect the headlights. Furthermore, he placed the manikin in a location that was consistent with Stachon's theory of the case. Therefore, any dissimilarities or variance based on the manikin's location, the headlights, or the missing trailers, should go to the weight of the experiment and does not warrant exclusion. The defendants can address those issues adequately on cross-examination without confusing or misleading the jury.

Based on the foregoing reasons, the Motion to Exclude Opinions of Plaintiffs' Designated Expert Stuart Nightenhelser [DE 72] is **DENIED**.

ENTERED this 30th day of September, 2015.

/s/ Andrew P. Rodovich
United States Magistrate Judge